MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

RAVI T. NARAYAN (CABN 331858)
Deputy Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6809
     FAX: (415) 436-7234
     mari.overbeck@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. 21-CR-311 EJD** |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hon. Edward J. Davila |
| PAUL VALENZUELA (aka "One Eye"), | Hearing Date:   November 18, 2024 |
| Defendant. | Time:        1:30 p.m. |

1  **I.      INTRODUCTION**

2          The government submits this memorandum in advance of the sentencing of defendant Paul

3  Valenzuela (aka "One Eye").  Valenzuela pled guilty to one count of Conspiracy to Commit Hobbs Act

4  Robbery in violation of Title 18, United States Code, Section 1951(a) based on his agreement to

5  conspire to obtain money or property from a residence in Union City, California.  The parties have

6  entered into a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B).  *See* ECF No. 106

7  (Plea Agreement).  During his change of plea hearing in front of the Honorable Yvonne Gonzalez

8  Rogers, Valenzuela asked the court for a Conviction Alternatives Program (CAP) assessment, which the

9  court granted.  On June 26, 2023, Valenzuela appeared before this Court and was invited to appear

10 before the CAP team for an informal status hearing.  Valenzuela was not accepted into CAP, but on

11 October 16, 2023, this Court accepted a comprehensive case management plan for Valenzuela and

12 continued sentencing for up to 18 months while Valenzuela participated in the Courage to Change

13 (CTC) group.  On November 18, 2025, Valenzuela is scheduled to be sentenced.  With recognition of

14 Valenzuela's successful participation in the CTC group, and considering all factors set forth in Title 18,

15 United States Code, section 3553(a), the government respectfully requests that the Court impose a

16 sentence of 366 days of custody with three years of supervised release, and a $100 special assessment.

17 **II.     FACTUAL BACKGROUND**

18        **A.      Procedural History**

19        On August 12, 2021, a federal grand jury returned a three-count indictment charging six

20 defendants with (1) Hobbs Act Conspiracy (Count One); (2) Conspiracy to Commit Murder in Aid of

21 Racketeering (Count Two); and (3) Conspiracy to Commit Assault with a Deadly Weapon/Assault

22 Resulting in Serious Physical Injury in Aid of Racketeering (Count Three).  ECF No. 1.  The indictment

23 alleges the defendants' membership in a racketeering enterprise known as "El Hoyo Palmas" (EHP), an

24 associated-in-fact group consisting of Norteño street gang members and associates.  On February 23,

25 2023, Valenzuela pled guilty to Count One as part of a global resolution of the charges set forth in the

26 indictment.[1]  The government has agreed to dismiss Count Two (VICAR murder conspiracy) and Count

27 _____

28 [1] This global resolution permitted the defendants to agree to either a B-plea or a C-plea, but the
government did not agree to any CAP assessments or CAP plea agreements given the nature of the
allegations charged in the case. Valenzuela's request for a CAP assessment occurred without any prior

Three (VICAR assault conspiracy) of the indictment as against Valenzuela at the time of sentencing. Plea Agreement ¶ 13.

### B.    Offense Conduct & Other Relevant Conduct

#### 1.    Background of El Hoyo Palmas

EHP is subservient to the Nuestra Familia (NF) prison gang and, specifically, the Santa Clara County Regiment of the NF, operating in San Jose, California and the surrounding Santa Clara County area.  *See* PSR ¶¶ 21–22.  EHP has been in existence in San Jose since the 1970s.  PSR ¶ 21.  EHP has its own logos, tags, hand gestures, and terminology to designate themselves in public settings, such as the letter "P" or the word "Palmas," the logo of the Pittsburgh Pirates professional baseball team, and Hawaiian style shirts with palm trees.

The NF and EHP have common purposes, which include: committing crimes of violence to promote and enhance the reputation of the enterprise and to keep rivals gang members in fear of it; enriching leaders, members, and associates through trafficking of controlled substances and firearms and through the commission of robberies; and providing financial support to gang members who are charged with crimes or incarcerated.  PSR ¶¶ 16–20, 22.

EHP, like other Norteño street gangs, has multiple "generations."  EHP is comprised of six generations.[2]  PSR ¶¶ 21, 24.  Each generation consists of several years' worth of members and has its own higher- and lower-ranking members.  Typically, one gains status within EHP based on the commission of violent acts on behalf of the gang (or the willingness to do so) or by making money through narcotics or other criminal ventures.  *See* PSR ¶¶ 18, 20.  The six generations of EHP loosely reflect seniority within the gang, with the first generation being the oldest and the sixth generation being the newest.  Meetings are held regularly, at which members pay dues and receive information about gang-related activities.  During the meetings, attendees were generally separated by their respective generation.  Prospective members need to prove their worth to gain entrance into EHP.  Gaining

notice to the government.

[2] In approximately 2009-2010, the San Jose Police Department conducted a large takedown of the earlier generations of EHP, many of whom were/are incarcerated.  Consequently, the generations that were the most active during the period relevant to this indictment were the fourth, fifth, and sixth generations.

entrance is often referred to as "being blessed."

EHP members are required to follow rules as dictated by both EHP and the NF more broadly. PSR ¶ 19. For EHP members, these rules were centered around respect, contributing to the gang monetarily through drug sales or other criminal activity, and not cooperating with law enforcement. PSR ¶ 19. A violation of the rules can be meet with "DP" or "discipline," which often involves being assaulted by other members. PSR ¶ 19. Other times a member can be "removed," which can include being killed. PSR ¶ 19

### 2.    Underlying FBI Investigation

The FBI utilized multiple wiretaps in the Operation Quiet Storm/Grim Dawn investigation (e.g., the related cases) into the NF and EHP. Regarding EHP, those wiretaps included interceptions captured on telephones utilized by Valenzuela's co-defendants:

| TELEPHONE USER | TARGET TELEPHONE |
|---|---|
| Juan Dominguez | TT6 |
| Jose Garcia | TT8, TT10 |
| Juan Gonzalez | TT9 |

Much of the evidence supporting the indictment in this case came from these intercepted communications, and through these intercepted communications, the FBI learned that Valenzuela was a senior member of the EHP gang, and was involved in criminal activities including robbery and drug dealing (primarily cocaine and methamphetamine).

### 3.    Union City Robbery Conspiracy

In early September 2018, several members of EHP conspired to rob drug dealers at a residence in Union City. From intercepted communications, the FBI learned of the conspiracy, which they were able to thwart prior to its commission.

The conspiracy began when Defendant Caleb Eller notified Defendant Jose Garcia of two marks (referred to in the intercepted calls as "licks") in an intercepted call on September 4, 2018. PSR ¶ 25; TT8, Session 3058. In that call, Eller informed Garcia that in one location the residents "push powder" (slang for cocaine) and said that he believed that by robbing the location, they would be able to "come

up" with at least a "brick" (slang for kilogram) as well as money for another brick.  PSR ¶ 25.  Garcia asked, "What's the deal with them? We have to knock doors down? Is there an easy way in? Or wait for somebody?"  Eller told him that the residents were two brothers who had already been robbed once before, and so he did not expect them to put up a fight, but that Garcia would have to "boot the door down and get it from them."  PSR ¶ 25; TT8, Session 3058.  Garcia responded, "Ok, ok, I don't give a fuck how it goes down."  TT8, Session 3058.  Eller said he would give Garcia the address of the house, and later texted Garcia "Union City" and "Drives a black Mustang."  PSR ¶ 25; TT8, Sessions 3089, 3091.  Garcia then contacted Defendant Kyle Leonis via text message, writing: "I have a job for us" and "I'm a make sure after this you are blessed."  TT8, Sessions 3068, 3070, 3072, 3074.  Defendant Leonis later responded that he was "wit whatever boy."  PSR ¶ 25; TT8, Sessions 3151, 3154, 3156, 3158, 3160.  Eller and Garcia continued to talk about the robbery, with Eller noting that if the two brothers who lived at the robbery mark were "slapped up a bit," they would "give up" the drugs and money. TT8, Session 3103.

In the days following, Valenzuela and others went to Union City to locate the robbery mark and conduct surveillance.  PSR ¶ 26.  For example, on September 10, 2018, Valenzuela and Garcia spoke, and Garcia told Valenzuela that he was going to doing "a little dry run" of the stash house location in Union City.  TT8 Sessions 4284, 4295.  Valenzuela joined him:  investigators conducted physical surveillance and saw Valenzuela pick up both Garcia and Defendant Juan Gonzalez and then drive to Union City to take a "dry run" at the proposed robbery location.  PSR ¶ 26.

On September 17, 2018, Garcia and Gonzalez discussed additional surveillance that Gonzalez had done of the Union City location, and Gonzalez notified Garcia that he had seen a couple with a baby at the address.  TT9, Session 4830.  Gonzalez told Garcia that he planned to go back to the address and "post up" (conduct additional surveillance), and both Garcia and Gonzalez discussed "needing this," because things had been "slow" lately.  TT9, Session 4835.

On September 19, 2018, Garcia told Gonzalez that Eller had confirmed that the marks were still selling drugs and that there likely was product at the house. They agreed that given that the children appeared to be school-aged, the best time for the robbery would be in the morning after the children were at school.  TT9, Session 5337.

### 4.    Suspected "Leak" & Obstruction Enhancement

On September 20, 2018, based on the intercepted calls summarized above, the FBI conducted a search warrant at the Union City residence. PSR ¶ 27. On October 2, Eller informed Garcia that federal agents had gone to the house. PSR ¶ 27. Garcia then called both Gonzalez and Defendant Juan Dominguez to tell them that the planned robbery was off. PSR ¶ 27. Specifically, Garcia told Gonzalez, "Never mind with all that, alright?" Gonzalez said, "Oh, ok. What happened?" and Garcia stated, "the fucking alphabet boys got 'em . . . they told them that somebody was going to pay them a visit." Gonzalez responded, "No shit . . . that's scary boy," and Garcia told him to "be smooth." TT10, Session 2756; TT10, Session 2764 (Garcia tells Dominguez: "The fucken alphabet boys got that address. You know the one.").

Garcia suspected that there was a "loose screw" (i.e., an informant) in their crew, and by October 14, intercepted communications revealed that Garcia believed that he had identified Victim-1 as the suspected informant. PSR ¶ 27; TT10, Sessions 2764, 2794; TT10, Session 377 (Garcia says: "I found the loose screw … it's in my own house"). Subsequent intercepted communications suggested that Garcia assaulted Victim-1 on October 14, and on October 15, Garcia told Dominguez that Garcia was told by "the homie" that Victim-1 needed to be "let go." PSR ¶ 27; TT6, Session 19315. That same day, Garcia told Leonis that Victim-1 was a "rat." PSR ¶ 27; TT10, Session 516. On October 16, 2018, Victim-1 did not show up for work and cut off contact with Garcia, Dominguez, Gonzalez, Leonis, and Valenzuela. Over the next two days, there were calls on the wires involving each of the defendants discussing Victim-1. *E.g.*, TT10, Session 810 (call between Garcia and Leonis, where Garcia says that he had someone call Victim-1's workplace to see if Victim-1 was there and was told that Victim-1 had not come to work, to which Garcia notes: "He's fucking scared for his life, fool."). On October 17, 2018, Valenzuela was intercepted calling Gonzalez to inform Gonzalez that Victim-1 (referred to in the call by Valenzuela as the "run around boy") had gone missing and left his belonging behind. PSR ¶ 29; TT9, Session 10985; *see also* PSR ¶ 29 and TT10, Session 1067 (October 18, 2018) (Valenzuela intercepted talking to Garcia about Victim-1; Valenzuela inquires whether Garcia has heard from Victim-1).

On October 19, 2018, Garcia was intercepted talking to Taylor Johnston, a suspected associate of

1  EHP and a suspected member of a gang known as the West Side Mob.  PSR ¶ 30.  During the

2  intercepted call, Johnston asked Garcia whether Victim-1 had come back, and Garcia said that he had

3  not.  Johnston said that he could not believe that Victim-1 had not come back and asked Garcia what the

4  neighborhood was saying, to which Garcia said, "it's on sight with him," "even if he comes back.'"

5  "On sight" means that EHP members are authorized and expected to use force against the individual

6  who has been targeted by the gang.  PSR ¶ 30.

7       **5.    Other Relevant Conduct[3]**

8       The intercepted communications in this case show that Valenzuela was a high-level EHP

9  member who was active in drug dealing and who was aware of the activities of the gang.[4]  Indeed, the

10  intercepted wires show multiple instances of Valenzuela engaging in drug trafficking between August

11  and September of 2018, including with co-defendant Gonzalez.  *See* PSR ¶ 28.  Gonzalez often would

12  use code words, such as "white girl" (cocaine), "brick" (a kilogram or "brick" of narcotics), and "car,"

13  "rims," and "test drive" when speaking about drugs during these calls.  For example, on August 29,

14  2018, Gonzalez and Valenzuela discussed drug prices—Valenzuela asked Gonzalez how much he

15  charges, and Gonzalez replied "375."  PSR ¶ 32.  Gonzalez continued: "I'm saying like, like, 425 at least

16  since it is usually what they go for."  *Id.*; TT9, Session 992.  In late September, Gonzalez complained to

17  Valenzuela about the quality of some of the drugs he had received.  On the calls, Valenzuela asked

18  Gonzalez, "What did you want me to tell him? Did you want your money back?"  Gonzalez replied:

19  "Get me another car," a "better running car" because "the sparkplug misfired."  Valenzuela said he

20  would get a resolution with the source of supply.  PSR ¶ 38; TT9, Sessions 4643, 5512, 6177, 6222,

21  6223; *see also* TT9, Sessions 2798, 2800, 2928, 3337 (Valenzuela discussing with Gonzalez purchasing

22  narcotics, with Valenzuela saying he planned to buy "at least a four and half" and wanted to be sure it

23  

24      [3] The below information is directly relevant to the charged conduct and to Valenzuela's history
25  and characteristics and is therefore properly included in the PSR.  *See* U.S.S.G. § 1B1.3(a)(1)(B); *United
    States v. Danielson*, 325 F.3d 1054, 1076 (9th Cir. 2003) ("A district court may consider uncharged
26  conduct for sentencing purposes when the conduct is relevant within the meaning of § 1B1.3(a)(1) of the
    Sentencing Guidelines.").

27      [4] Members of EHP were intercepted over Target Telephone 6 (Sessions 9469, 9471, 9472, 9550,
    9739) discussing a shooting that had occurred involving the son of EHP member "Moses Martinez."
28  During these calls, Valenzuela is mentioned as someone to call to obtain additional information about
    the shooting.

1   was the same and "retest" it or "cut the brick myself," noting that he planned on giving Gonzalez

2   "three.").

3   **III.    Valenzuela's Criminal History**

4   Valenzuela has a 2009 felony conviction for gross vehicular manslaughter while intoxicated.

5   PSR ¶ 48.  He also has a 2008 misdemeanor DUI conviction.  PSR ¶ 49.  The government agrees with

6   Probation's calculations that Valenzuela's total criminal history score is four, which places him in a

7   Level III Criminal History Category.  PSR ¶¶ 48–50.

8   **IV.    SENTENCING RECOMMENDATION**

9   Consideration of all of the sentencing factors set forth in Title 18, United States Code, Section

10  3553(a) demonstrates that a 366-day sentence for Valenzuela is sufficient, but not greater than

11  necessary, to comply with the purposes set forth in Section 3553(a), paragraph (2).

12  Valenzuela's offense was dangerous and, but for the FBI's intervention, his actions would have

13  posed great peril to those he planned to rob and to those in the surrounding community.  The motivation

14  behind the robbery plot was captured in the intercepted call between Garcia and Gonzalez, where the

15  two discussed that the crew "needed" to hit the mark to secure both a brick of cocaine and money that

16  could be used to buy another brick because things had been "slow" lately— motivations suggestive of

17  larger, ongoing criminal purposes, including drug-trafficking.  Valenzuela's actions demonstrate that he

18  was ready and willing to take part in the planned robbery: he volunteered to go with Garcia and other

19  members of the EHP crew to do a "dry run," and was active over the wires engaging in other drug-

20  trafficking.  Once the robbery plot was thwarted, Valenzuela—a high-ranking member of EHP, who was

21  aware of the rule that gang members must not cooperate with law enforcement—was among those who

22  were informed that Victim-1, the suspected "snitch," had fled town, and was captured on the wires

23  passing this information to other EHP members and inquiring about Victim-1's status and "what could

24  be done."  These calls placed Valenzuela on notice of Victim-1's suspected cooperation, resulting in the

25  neighborhood saying that "it's on sight with him"—meaning that EHP members were expected to

26  commit violence against Victim-1 if and when he was located.  The crime at issue is no doubt serious

27  and deserving of a custodial term to reflect the seriousness of the offense, to promote respect for the law,

28  and to provide just punishment, and to afford adequate deterrence to similar criminal conduct being

U.S. SENT. MEMO. RE PAUL VALENZUELA          7
21-CR-311 EJD

1    contemplated by others.  18 U.S. Code § 3553(a)(2).

2    As noted, the government does not dispute Probation's determination that Valenzuela has a

3    Criminal History Category of III, and the government agrees with Probation's Guidelines calculations of

4    an offense level of 20, after acceptance of responsibility.[5]  That yields a guidelines calculation of 41

5    months to 51 months (*see* PSR ¶ 81).

6    The government's recommended sentenced is a significant downward variance that takes into

7    account (1) Valenzuela's acceptance of responsibility as part of a global resolution with his co-

8    defendants, which resolution generally facilitated a speedy resolution of the matter (and prior to

9    cooperators being identified); and (2) Valenzuela's success in the Courage to Change program (PSR ¶¶

10    6, 71) and his corresponding efforts towards rehabilitation while on pre-sentence release.  The

11    government's recommendation also takes into consideration the need "to avoid unwarranted sentence

12    disparities among defendants with similar records who have been found guilty of similar conduct."  18

13    U.S.C. § 3553(a)(6).  Each of Valenzuela's co-defendants—who were just as culpable as Valenzuela,

14    especially considering Valenzuela's high-rank within EHP and the manifold drug-trafficking activities

15    he was captured participating in over the wiretaps—have been sentenced to custodial terms,

16    notwithstanding their exemplary pretrial release records, familial obligations, and significantly traumatic

17    upbringings.  *See* PSR at p. 2; *see also* ECF Nos. 122 (Garcia Sentencing Memorandum); 133

18    (Dominguez Sentencing Memorandum); 168 (Gonzalez Sentencing Memorandum); 195 (Leonis

19

20    _____

[5] The government submits that the obstruction enhancement is proper in this case. As a high-
21    ranking member of EHP, Valenzuela knew and/or could reasonably foresee that Victim-1 would be
subject to violent retaliation because of his suspected cooperation with law enforcement. As the
22    government has set forth, the evidence in this case shows that Garcia was communicating with other
members of EHP about Victim-1's suspected cooperation, and those other members were
23    communicating and informing each other about Victim-1 having disappeared, including in the call
between Valenzuela and Gonzalez.  As a high-ranking member of EHP, Valenzeula would have known
24    and/or could have reasonably foreseen that he and other members of EHP were expected to retaliate
against Victim-1 if/when they saw Victim-1 for Victim-1's suspected role in exposing the robbery plot
25    to law enforcement.  The Court may consider all the evidence in this case in its assessment of the
enhancement, including the actions of Valenzuela's co-defendants. *See* U.S.S.G. § 1B1.3(a)(1) (defining
26    "[r]elevant [c]onduct" for sentencing to include acts undertaken "in the course of attempting to avoid
detection or responsibility for th[e] offense"); U.S.S.G. § 3B1.1 cmt. n.1 (defining "participant" as "a
27    person who is criminally responsible for the commission of the offense, but need not have been
convicted"); *United States v. Thomsen*, 830 F.3d 1049, 1071 (9th Cir. 2016) (explaining that a
28    sentencing court may consider "charged, uncharged, and even acquitted conduct" when applying an
enhancement).

1  Sentencing Memorandum).  Considering these factors, as well as each of the Section 3553(a) factors,

2  including the need to avoid disparities among defendants with similar records who have been found

3  guilty of similar conduct, the government's proposed 366-day sentence is "sufficient but not greater that

4  necessary" to satisfy the sentencing goals of Title 18, United States Code, Section 3553.

5  **V.    CONCLUSION**

6        For the reasons set forth above, the government requests that the defendant be sentenced to 366

7  days of imprisonment followed by three years of supervised release, and a $100 special assessment, with

8  a fine to be determined by the Court.

9  DATED:  November 10, 2024                    Respectfully submitted,

10                                             MARTHA BOERSCH
                                               Chief, Criminal Division
11

12                                             _____/s/_____
                                               MARI OVERBECK
13                                             Assistant United States Attorney